## GROW v. OREGON SHORT LINE RY. CO.

No. 2414. Decided October 7, 1913. On rehearing February 5, 1914 (138 Pac. 398).

1. EVIDENCE—JUDICIAL NOTICE—LAWS OF OTHER STATES. The courts of the forum cannot take judicial notice of the laws of a sister state. (Page 166.)

2. EVIDENCE—PRESUMPTION—FOREIGN LAWS. In the absence of proof it will be presumed that the law of a foreign state is the same as that of the forum, this presumption being applicable, not only to the common law, but to the statutory law.[1] (Page 166.)

3. EVIDENCE—PRESUMPTIONS—FOREIGN LAWS. In an action for the wrongful death of a servant of a railroad company who was killed in a foreign state, it will, in the absence of evidence of the laws of that state, be presumed that laws similar to Comp. Laws 1907, secs. 1343, 2912, giving a right of action for wrongful death, and defining fellow servants, were in force at the place of the accident, and that under such law those employees in charge of a railroad train were not fellow servants of track laborers.[2] (Page 168.)

4. MASTER AND SERVANT—TRACK LABORERS—INJURIES BY TRAIN—DUTY OF CARE. Employees of a railroad company in charge of a train, who have knowledge of the presence of track laborers, must use care to prevent injuring them, and such laborers cannot

---

[1] American Oak Leather Co. v. Union Bank, 9 Utah, 87, 33 Pac. 246; Dignan v. Nelson, 26 Utah, 186, 72 Pac. 936; Stanford v. Gray, 42 Utah, 228, 129 Pac. 423.

[2] Meyers v. San Pedro L. A. & S. L. R. Co., 36 Utah, 307, 104 Pac. 736, 21 Ann. Cas. 1229; Neesley v. Southern Pac. Co., 35 Utah, 259, 99 Pac. 1067; Shepherd v. Denver & R. G. Co., 41 Utah, 469, 126 Pac. 692; Vota v. Ohio Copper Co., 42 Utah, 129, 129 Pac. 349.

be treated as trespassers for whom no lookout need be kept. (Page 168.)

5. MASTER AND SERVANT—LABORERS ON TRACK—DUTY OF CARE. Laborers on the tracks of a railroad company are bound to exercise care for their own safety, and to do all that a prudent person under similar circumstances would do to avoid injury from trains. (Page 168.).

6. MASTER AND SERVANT—INJURIES TO SERVANT—ACTIONS. In an action for the wrongful death of a servant of a railroad company run down by a train, evidence of the negligence of the servants in charge of the train and of the deceased's freedom from contributory negligence *held* sufficient to go to the jury. (Page 168.)

7. MASTER AND SERVANT—INJURIES TO SERVANT—FELLOW SERVANTS— ASSUMPTION OF RISK. A railroad employee who works upon the tracks and is carried to and from work on a hand car or tricycle does not assume the risk of injury from the negligence of servants in charge of a train, for such servants are not his fellow servants. (Page 169.)

8. COMMERCE—INTERSTATE COMMERCE—WHO ARE "ENGAGED IN INTER- STATE COMMERCE." A servant of a railroad company engaged in both interstate and intrastate commerce, employed in installing a new block system along the tracks which was designed to protect all trains, is "Engaged in interstate commerce" within the federal Employers' Liability Act; the block system being for the benefit of interstate trains. (Page 170.)

9. MASTER AND SERVANT—CONTINUANCE OF RELATION. Where a servant of a railroad company engaged in installing an automatic block system was being carried from his work on a tricycle which ran on the tracks, the relation of master and servant existed at that time as to the master's liability for the negligence of other servants in charge of a train, who ran down the servant on the tricycle. (Page 181.)

### ON REHEARING.

10. MASTER AND SERVANT—INTERSTATE COMMERCE—FEDERAL EM- PLOYERS' LIABILITY ACT. The purpose of the federal Employers' Liability Act (Act April 22, 1908, ch. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]) is not to abridge, but to enlarge, the liability of interstate carriers, and a servant engaged in interstate commerce who is injured may recover under the common law, where the facts and circumstances would entitle him to maintain an action thereunder regardless of the statute. (Page 185.)

44 Utah—11

11. EVIDENCE—PRESUMPTIONS—REBUTTAL OF PRESUMPTIONS.  In an action for the wrongful death of a servant killed in a foreign state, the master, if desiring to rebut the presumption that the laws of the foreign state were the same as those of the forum, must introduce evidence of the law of the *situs*.  (Page 186.)

12. APPEAL AND ERROR—CHANGE OF THEORY ON APPEAL.  In an action for the wrongful death of a servant killed in a foreign state, the original complaint alleged facts and circumstances which entitled plaintiff to recover under the federal Employers' Liability Act (Act April 22, 1908, ch. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]) if the deceased was engaged in interstate commerce, and further alleged the existence of statutes of the state of the *situs* of the accident permitting a recovery for wrongful death on motion of plaintiff.  The allegations concerning the law of the *situs* were stricken, and the defendant filed a new answer to the amended complaint, which did not plead the foreign statute.  Upon trial a directed verdict was rendered for defendant based, not only upon the ground that deceased was not engaged in interstate commerce, but also on the ground that he was guilty of contributory negligence and had assumed the risk.  *Held*, that as both parties generally introduced evidence of negligence and contributory negligence, it could not be claimed that plaintiff based her entire right to recover upon the federal Employers' Liability Act, and so could not on appeal contend that she was at least entitled to recover under the common law.  (Page 186.)

FRICK, J. dissenting in part.

Appeal from District Court, Second District; *Hon. J. A. Howell*, Judge.

Action by Cecillia Grow as administratrix of Cyrus L. Grow, deceased, against the Oregon Short Line Railroad Company.

Judgment for defendant.  Plaintiff appeals.

REVERSED AND REMANDED.

*John G. Willis* for appellant.

*P. L. Williams, Geo. H. Smith, F. K. Nebeker* and *C. R. Hollingsworth* for respondent.

STRAUP, J.

This is an action to recover damages for the death of plaintiff's intestate. At the conclusion of the evidence the court directed a verdict in favor of the defendant. The plaintiff appeals.

The essential allegations of the complaint are: That the defendant, a Utah corporation, was and is a common carrier, operating a line of railway through and between the states of Utah, Wyoming, Idaho, Montana, and Oregon, that at the time of the accident it was, and prior thereto for several months had been engaged in installing, and equipping its main line of railway with, what is known as a "block signal system," and that the deceased, who was in its employ and with others engaged in such work, was, near Mora, Idaho, run over and killed by an interstate passenger train operated by the defendant from Salt Lake City, Utah, to Huntington, Or. The alleged negligence is that the train was operated at a dangerous and excessive rate of speed, without signals or warning of its approach, without a headlight, and without observing a lookout. The defendant denied the alleged negligence, and pleaded assumption of risk and contributory negligence.

The evidence shows that the defendant, an interstate carrier by rail, was installing and equipping its main line from Salt Lake City, Utah, to Huntington, Or., with automatic block signals. It began such work at both ends, one at Salt Lake, the other at Huntington. As we gather from the record, automatic block signals do away with signalmen at the ends of block stations, and afford protection against obstructions on, or breaks in, the track, and especially indicate to train operatives when a train is running ahead of them or approaching them. The mechanism of the signals is not minutely or definitely described. Nor is that essential. They are sufficiently described to show that they are constructed along the track and connected with it in such manner as to be affected and operated by trains passing over the track, or by obstructions on, or breaks in, the track, and afford protection against, and prevent, accidents and colli-

sions in the operation of trains. A witness, after generally describing the semaphores, casings, poles, motor, or battery, slot arm or connection rod, the arm signals or blades, etc., testified that:

"The automatic signals are operated from the rail by trains on or passing over the track, an electric current on the rail and the train causing a shunt through a relay, the circuit is carried from the pole line that controls all signals in opposite directions."

The blocks constiute a section or unit two or three miles in length, and are so constructed as to be operated independently of each other. At the time of the accident the system was completed, except for a distance of about forty-five or fifty miles in Idaho between Nampa on the west and Reverse on the east, and was in operation and in use west from Nampa to Huntington and east from Reverse to Salt Lake by the defendant in the operation of trains and in doing an interstate commerce business. For the distance of forty-five or fifty miles nothing had been done, except the construction of concrete foundations for the signals. The deceased and four other employees were engaged in installing the system about three miles east of Kuna, a place between Nampa and Reverse. They were in charge of a foreman. The deceased and the foreman preceded the other employees measuring off and locating places to put poles. The others followed digging post holes and stringing wire. Their outfit was temporarily maintained at Kuna, where they boarded and lodged in cars furnished by the defendant. The usual quitting time was six o'clock p. m., but the employees generally quit in time to return to their lodging place by six. On January 5th the foreman and the deceased quit at about five-thirty in the evening and started back on a gas motor tricycle operated on the track. The evening was cold and cloudy, the track frosty. A brisk wind blew from the west, the direction in which they were going. Because of the cold and the frost, the foreman and the deceased had difficulty in starting and operating the motor of the tricycle, which in starting and running made much noise. The foreman placed

the deceased on the front end of the tricycle to hold the front wheels more firmly on the track. He sat on the tricycle facing a little east of south. They were going west to Kuna, their lodging place. The foreman was at the rear, shoving the tricycle to start it. When they reached the place where the four men were at work they carried the tricycle around a hand car on the track. The deceased again took the same position on the front end of the tricycle, the foreman at the rear, getting off and on shoving the tricycle on their way to camp. A passenger train with two engines approached from the east fourteen hours late, at seventy miles an hour (some of the witnesses testified forty-five or fifty, but we must take the evidence most favorable to the plaintiff against whom the verdict was directed), without signals or warning of its approach, without a headlight, and without the train operatives observing an outlook. It first reached the four men and the hand car on the track, who then were also quitting work and gathering tools. One of them, discovering the train, called to his fellow workmen, who barely got the hand car off the track, avoiding a collision. As they passed, the fireman said to the engineer that "was a close call for those fellows." They did not discover the foreman and the deceased on the tricycle until, according to the testimony of the train operatives, within a car length of them. At that moment, the foreman, discovering the train, suddenly threw himself from the tricycle, escaping unhurt. Grow, the deceased, was struck and killed. The train ran from one-half to three-quarters of a mile before it was stopped. It then backed up and took the deceased to Nampa. The track at the place of the accident was straight, the view unobstructed. The sun had set, and, though it was cloudy, yet it was sufficiently light to see a train a mile or more away. The men on the tricycle could be seen by train operatives for about the same distance. The engineer, as testified to by himself, "was not keeping a lookout," and, for that reason, did not discover the men on the tricycle until but a car length away. He knew he had struck the tricycle, but did not know, as he testified, that he had struck or hurt any one until the train was backed up.

A motion was made to direct a verdict on the grounds:

(1) That the deceased was not, at the time of the accident, engaged in work connected with or related to interstate commerce, but had completed his labors for the day and was on the way from his place of work to his place of abode; (2) that the signal system was not fully completed, and hence not in use by the defendant in the operation of its trains, or in connection with interstate commerce; (3) that the servants operating the train, whose negligence is complained of, were not engaged in interstate commerce; (4) that the defendant was not guilty of the acts or omissions complained of; and (5) that the deceased was guilty of contributory negligence, and assumed the risk.

The motion was granted on the grounds:

(1) Insufficiency of the evidence to show negligence, on the theory, as stated by the court, that the defendant was "under no duty to give warning to a sectionman working upon the track, or any other employee working upon its track, except the duty of seeking to prevent injury to the employee after his discovery upon the track has been made;" (2) that the deceased, sitting on the tricycle in the position he was, and capable of seeing the train had he looked, "assumed the risk by staying there of any injury which he might suffer;" and (3) that he, at the time of the injury, was not engaged in interstate commerce.

Counsel for both parties have largely argued the case upon the proposition or theory of whether the case is within or without the provisions of the act of Congress relating to the liability of interstate common carriers by rail to their employees. The act provides that every common carrier by railroad, while engaging in commerce between any of the several states, etc., shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his personal representatives, etc., for such injury or death, resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, etc. It further provides that contributory negligence

shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee, and where a violation by such carrier of any statute enacted for the safety of the employees contributed to the injury or death, the employee shall not be held to be guilty of either contributory negligence or assumption of risk.   Act April 22, 1908, ch. 149, 35 Stat. 65; U. S. Comp. St. Supp. 1911, p. 1322, and amendment, Act April 5, 1910, ch. 143, 36 Stat. 291 (U. S. Comp. St. Supp. 1911, p. 1324.)

On the one side it is contended that the case is within the provisions of this act, and hence the verdict was erroneously directed; on the other, that the case is without, and hence the verdict was properly directed.   But manifestly the disposition of this question is not necessarily determinative of the ruling directing the verdict.   Though the case is not within the provisions of the act, still, if the questions respecting the alleged negligence, contributory negligence, and assumption of risk are, on the record, questions of fact, the case ought to have been submitted to the jury on proper instructions applicable to the law of negligence of the State of Idaho, where the injury and death occurred.   True, under the common law, no cause of action existed to recover damages for the death of one caused by the wrongful or negligent act of another, and no statute of Idaho giving such a right of action was pleaded or put in evidence.   We, of course, cannot take judicial notice of the laws of a sister state.   That is well settled.   But it is equally well settled in this jurisdiction that, in the absence of proof, it will be presumed that the law of another state is the same as the law of the forum.   In some jurisdictions the presumption is held applicable only to the common law.   To the contrary, and, as we think, by the weight of authority—at least by the greater number of cases—the presumption is also extended to the statutory law.   The cases so holding are collected and noted in 20 Cent. Dig., Title, Evidence, section 101; 8 Dec. Dig., Title, Evidence, section 80 (1); notes 21 L. R. A. 467; 16 Cyc. 1084; 1 Ann. Cas. 460.   And, as Mr. Jones in his work

on Evidence (section 83 [2d Ed.]) puts the proposition, the court will administer and apply the law of the jurisdiction until the law of the situs is shown.

But whatever diversity of opinion may exist as to this, the rule is firmly established in this jurisdiction that the presumption extends to the statutory law as well as to the common law. (*Am. Oak Leather Co. v. Union Bank,* 9 Utah, 87, 33 Pac. 246; *Dignan v. Nelson,* 26 Utah, 186, 72 Pac. 936; *Stanford v. Gray,* 42 Utah, 228, 129 Pac. 423.) There are some recognized exceptions—statutes relating to forfeitures and penalties—here not involved.

We have in this state a statute (Comp. Laws 1907, section 2912) giving a right of action for damages where the death of one is caused by the wrongful or negligent act of another, and, in the absence of evidence, following the rule adopted in this jurisdiction, we presume the law of Idaho to be the same. We also have a statute defining fellow servants. (Comp. Laws 1907, section 1343.) Under that statute the deceased and the train crew were not fellow servants. (*Meyers v. S. P. L. A. & S. L. R. Co.,* 36 Utah, 307, 104 Pac. 736, 21 Ann. Cas. 1229; *Neesley v. So. Pac.,* 35 Utah, 259, 99 Pac. 1067; *Shepherd v. D. & R. G. Co.,* 41 Utah, 469, 126 Pac. 692; *Vota v. Ohio Copper Co.,* 42 Utah, 129, 129 Pac. 349.) Again, in the absence of evidence, we presume the law of Idaho is similar. Hence, does it follow that on the record the defendant, independently of the act in question, is responsible for the negligence, if any, committed by the train crew in the particulars charged.

This, then, brings us to the question of sufficiency of the evidence to require a submission of the case to the jury. We cannot yield assent to the proposition that train operatives in the operation of trains owe no duty to use care toward those engaged at work along the track. Train operatives may not, as the trial court seems to think they might, regard them as trespassers to whom no duty is owing, except to refrain from injuring them after discovering them in a perilous or dangerous position. Where men are engaged at work upon and along a track day after day for

months, as was the deceased and his co-employees, it may well be presumed that train operatives have knowledge thereof, and hence are required to use care toward them to avoid injury. True, the law does not itself, at such a place where the injury occurred, prescribe or restrict the rate of speed at which trains may be operated, nor itself prescribe rules for the observance of outlooks, nor the giving of signals or of warning of the approach of trains. But the law, under the circumstances disclosed, does impose the duty to use care toward those engaged at work along or upon the track, care in the operation of trains with respect to speed, warnings, signals, and outlooks. Whether the duty was properly discharged, whether the speed was excessive or dangerous, and whether the failure to give signals or warning of the approach of the train, or to observe an outlook, was negligence depended on a variety of things, and upon the particular facts and circumstances of the case; hence such question generally is one of fact. We think it was here. So as to the deceased. A duty was also imposed on him to exercise care for his own safety and to do all that a prudent person under similar circumstances ought to have done. Did he do it? Did his conduct come up to that standard? We think that, too, was a question of fact. We cannot say that one, sitting on a tricycle under the circumstances as was the deceased, with his face to the south or southeast, and failing to look or see the train approaching, was conclusively guilty of negligence. Whether his conduct, like that of the train operatives, amounted to negligence was also dependent upon a variety of things and the particular facts and circumstances of the case. Hence the question of contributory negligence was also one of fact.

Now, as to assumption of risk. We see nothing to that. The deceased's conduct involved questions of contributory negligence, but not of assumption of risk. The two should not be confused. The triers of fact may say          7 that one sitting on a tricycle as did the deceased, and failing to look or see the approaching train, was guilty of negligence; but the proposition involves no element of as-

sumption of risk, unless it be said the train operatives were fellow servants with the deceased, for it is the rule that an employee assumes risks of danger arising from the negligence of fellow servants. But, on the record, as has been seen, the train operatives and the deceased were not fellow servants. And apart from that there is no element of assumption of risk present. Certainly an employee working upon a track does not assume the danger or risk of being negligently run over and injured or killed, by trains with the operation of which he has nothing to do, unless he and the operatives whose negligence caused the injury are fellow servants. Such a danger is not an ordinary or usual danger incident to his employment. It here was one due to negligence, negligence of the train operatives for which, on the record, the defendant is responsible, or negligence of the deceased, or of both the train operatives and the deceased. If one sees an approaching train and does not get out of the way, or fails to look and see it when due care required him to look and see it, and is run over and injured, he is guilty of negligence; but, it is a confusion of terms to say he assumed the risk.

So far we have considered the case independently of the congressional act, and have reached the conclusion that the plaintiff, on the record, was entitled to go to the jury. (*Zachary v. North Carolina R. Co.*, 156 N. C. 496, 72 S. E. 858.) But, as the judgment must be reversed and the case remanded for a new trial, it is proper to determine whether the plaintiff, on the record, was entitled to have it submitted under the provisions of the congressional act. To bring the case within that act it, of course, must be made to appear that the defendant was engaged in interstate commerce, that the deceased was in its employ, and that the death resulted, in whole or in part, from the negligence of an officer, agent, or employee of the defendant, while the deceased was employed in such commerce. It is conceded that the defendant was engaged in interstate commerce. And, as has been seen, the evidence is sufficient to show negligence on the part of the train operatives—em-

ployees of the defendant—and that the death resulted wholly or in part therefrom. The further question, and the one which chiefly divides the parties, is, Was the deceased, at the time of the accident, employed in interstate commerce? The answer to that is dependent upon the meaning of the words, as used in the act, "while employed in such commerce," interstate commerce. Upon that a variety of judicial views has been expressed, both by the state and the federal courts.

But they have been judicially considered and construed by the Supreme Court of the United States in the case of *Pedersen v. Delaware, L. & W. R. Co.*, 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125. The case originated in the Circuit Court of Pennsylvania, reported in 184 Fed. 737, carried on appeal to the Third Circuit Court of Appeals, reported in 197 Fed. 537, 117 C. C. A. 33, and from there to the Supreme Court of the United States. As stated by the circuit court, whose statement was adopted by the Court of Appeals, the defendant, the railroad company, did both an interstate and intrastate business, and that

"at the time of the plaintiff's injury it was engaged in building an additional track near Hoboken, N. J. Part of this track was to be laid upon a bridge, and the plaintiff was hurt upon the uncompleted structure while carrying material from one part of the work to another. The verdict establishes the facts that the negligence of a locomotive engineer was one cause of the injury, and that the plaintiff, if negligent at all, was nevertheless entitled to recover a considerable sum. The new track when finished was intended for use both in local business and in commerce between the states, but the train by which the injury was inflicted was a purely local train, running between two points in the state of New Jersey."

The circuit court held that, since the plaintiff "was injured by the act of the defendant done in the performance of purely intrastate business," he was not entitled to recover, and directed the entry of a judgment in favor of the defendant. The Court of Appeals affirmed the judgment on the theory that neither the defendant nor the plaintiff, at the time of the injury, was engaged in interstate commerce. Said that court:

"The plaintiff was an iron worker on a bridge on which an additional track was being placed. In getting rivets for the bridge he went upon the main east-bound track of the road, where he was struck and injured by a local and intrastate train coming in the other direction. Under such facts it is clear that neither by operating such local train or by building an additional track or bridge, or by sending the man for the rivets, was the carrier 'engaged in commerce between any of the several states,' nor was the plaintiff by helping to build such bridge, or by going upon a track which the company was not at the time using in interstate commerce 'employed by such carrier in such commerce.' "

The Supreme Court of the United States held that both the carrier and the plaintiff were engaged in interstate commerce within the meaning of the act. Mr. Justice Van Devanter, in delivering the opinion of the court, said that it was conceded that the defendant was engaged in interstate commerce, and hence the court was "only concerned with the nature of the work in which the plaintiff was employed at the time of his injury." With respect to that he said:

"The plaintiff was an iron worker employed by the defendant in the alteration and repair of some of its bridges and tracks at or near Hoboken, N. J. On the afternoon of his injury the plaintiff and another employee acting under the direction of their foreman, were carrying from a tool car to a bridge, known as the Duffield bridge, some bolts or rivets which were to be used by them that night, or very early the next morning, in 'repairing that bridge,' the repair to consist in taking out an existing girder and inserting a new one. The bridge could be reached only by passing over an intervening temporary bridge at James Avenue. These bridges were being regularly used in both interstate and intrastate commerce. While the plaintiff was carrying a sack of bolts or rivets over the James Avenue bridge, on his way to the Duffield bridge, he was run down and injured by an intrastate passenger train, of the approach of which its engineer negligently failed to give any warning."

The test, said he, in determining whether or not an employee was employed in interstate commerce, is this:

"Is the work in question a part of the interstate commerce in which the carrier is engaged? . . . Was that work [at or upon which the employee was engaged] being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it."

He argued that

"tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars; and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair."

In support of the holding that the plaintiff there was engaged in interstate commerce the court approvingly cited, among others, the case of *Zikos v. O. R. & N. Co.* (C. C.) 179 Fed. 893, where it was held that a section hand, working on a track of a railroad over which both interstate and intrastate traffic is moved, is employed in interstate commerce within the meaning of the act; *Central R. Co. of N. J. v. Colasurdo,* 192 Fed. 901, 113 C. C. A. 379, where a railroad trackman was injured while repairing a switch in a terminal yard; *Darr v. B. & O. R. Co.* (D. C.) 197 Fed. 665, where the employee was making repairs on an engine used in interstate commerce; and *Northern Pac. Ry. Co. v. Maerkl,* 198 Fed. 1, 117 C. C. A. 237, where the employee was injured in a repair shop, making repairs on a car used indiscriminately in both interstate and intrastate commerce.

Directly applicable to the case in hand and to the point that the deceased was employed in interstate commerce within the meaning of the act are the very recent cases of *Horton v. Oregon-Washington R. & N. Co.* (Wash.) 130 Pac. 897; *Montgomery v. So. Pac.* (Or.) 131 Pac. 507, where many of the cases bearing on the question, especially those from the federal courts and Supreme Court of the United States, are cited and reviewed. We think them in harmony with the prevailing opinion of the court in the Pedersen Case.

The dissenting members of the court, in the Pedersen Case took the view that the act does not extend to the incidents of interstate commerce, but is confined "to transportation" and, hence, those employees "engaged in interstate commerce" are "those engaged in transportation, which is commerce," and, unless so employed, are not engaged in such commerce. That, of course, would exclude employees working on or repairing a track, bridge, car, engine, or other instrumen-

tality used in interstate commerce and would include only those who were directly engaged in moving traffic, directly engaged in transportation. But Mr. Justice Van Devanter, for the court, has made it clear that the words "while employed in" interstate commerce are not to be so restricted and confined, and that when the object of the act is considered, are sufficiently broad to include all employees doing work "so closely related to such commerce as to be in practice and legal contemplation a part of it," and to include those working on, or repairing, cars, engines, tracks, bridges, roadbeds, works, or other equipments, used in interstate commerce. When the case at bar was argued and presented the Pedersen Case was pending in the Supreme Court of the United States. The opinion of the Court of Appeals was cited and strongly relied on by the respondent in support of its contention that the deceased was not, at the time of his injury, employed in interstate commerce. It was argued, and, as held by the dissenting members of the Supreme Court in the Pedersen Case, that, to be so employed, it was necessary that he be engaged in actual transportation, in moving traffic. The further point also was made that he was not so engaged—employed in such commerce—because the work, the particular block, the thing upon or at which he was working at the time of the injury, was not completed, and therefore was not then being used by the defendant in such commerce, though it then was using, in carrying on its interstate commerce or business, all the blocks to the east and west thereof which had been completed.

Upon a similar argument and ground was the case of *Johnson v. So. Pac. Co.*, 117 Fed. 462, 54 C. C. A. 508, ruled by the eighth circuit court of appeals. That case involved the Congressional Act requiring interstate carriers to equip cars "used in moving interstate traffic" with automatic couplers. The circuit court of appeals, in an opinion by Mr. Justice Sanborn, held that neither a dining car, standing empty on a side track at an intermediate station where it had been left by a train engaged in interstate traffic until it should be taken by another train engaged in the same traffic

going in the opposite direction, nor the engine used to draw it to a turntable, where it was turned and again placed on the side track, was, in such operation, "used in moving interstate traffic," and hence neither was required to be equipped with automatic couplers as by the act provided. But that argument was repudiated by the Supreme Court of the United States in the same case, 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363. Now the same kind of argument has been made in about every case involving the act here in question. That is, in about every case where the employee was engaged in making repairs on a car, or engine, or other instrumentality, which had been used in interstate commerce, but which then was temporarily out of commission, it was urged that the employee was not then "employed in interstate commerce," because the thing or instrumentality upon which he was working at the time of the injury was not then being used in such commerce. Upon that ground was the Pedersen Case ruled by the Circuit Court of Appeals, and upon that authority, and following that ruling, were ruled the cases of *Bennett v. Lehigh Valley R. Co.* (D. C.) 197 Fed. 578; *Heimback v. Lehigh Valley R. Co.* (D. C.) 197 Fed. 579; *Feaster v. Phila. & R. Ry. Co.* (D. C.) 197 Fed. 580. But again, that doctrine was flatly repudiated by the federal cases cited and approved by the Supreme Court of the United States in the Pedersen Case, and was not applied or regarded in that case by either the majority or minority members of the court as a controlling or determinative factor, for the former, as the controlling factor, ruled the case from the standpoint of whether the work being done by the employee at the time of the injury was something done independently of the interstate commerce in which the defendant was engaged, or so closely connected therewith, as to be a part of it, the latter considering it from the standpoint of whether the employee was, at the time of the injury, "engaged in transportation, which is commerce." We think the rule announced in the Pedersen Case is decisive of the question here. If, as there announced, an employee engaged in repairing a car, engine, or track, or constructing or repairing a switch or bridge

along a track used in interstate commerce, is, within the meaning of the act, employed in such commerce, then, do we think, was the deceased here also employed in such commerce. The defendant confessedly was engaged in interstate commerce. In carrying on such commerce it had been, and then was, using its track and line of railway for such purpose from Salt Lake to Huntington. For the better conduct of such commerce and the moving of such traffic, and to promote the safety of employees in operating interstate trains and of passengers transported from state to state, it was necessary, or, at least, desirable, to equip its line of railway with block signals. For that purpose were they installed. They are not separate and apart from the track, something operated independently of it, or independently of the interstate commerce in which the defendant was engaged, but are, in a sense, a part and parcel of the track itself, something attached to, and operated in connection with, it in carrying on such commerce. Now, should it be said that an employee in repairing a car which had been, and was intended to be, used in interstate commerce is employed in such commerce, but if he be engaged in attaching to such a car a new appliance, or equipment, something not theretofore used on such car, or by such carrier, he is not engaged in such commerce? or, if the employee is engaged in repairing a bridge along a track used in interstate commerce he is engaged in such commerce, but if he, along such a track, is engaged in putting in a new bridge or conduit where theretofore there was none, he is not engaged in such commerce? or, if one along such a track—one used in interstate commerce—is engaged in taking up an old or defective rail and inserting a new one, he is engaged in such commerce, but if he, for the better operation of trains along such a track and to promote the safety of passengers carried on and employees operating interstate trains, is engaged in attaching to such a track some new appliance or equipment, he is not engaged in such commerce? Suppose that in pursuance of its business of interstate commerce, and to better carry it on, the defendant had been engaged in putting in a switch along its track

used in such commerce, or in constructing a double track over a part or all of the way. Is there any good reason for holding that an employee, who is engaged in repairing the track or switch theretofore constructed and used, is employed in such commerce, but that one engaged in putting in the new switch, or the additional track, is not employed in such commerce? Or, suppose an employee had been engaged several blocks to the west from where the plaintiff was at work, say near Nampa, where the blocks were completed and in use, in repairing one of those blocks. Admittedly such an employee would have been employed in interstate commerce, for such a block was then in use, but since the plaintiff was at work on an uncompleted or unfinished block, which was not yet in use, he was not engaged in such commerce. Or, lastly, if an employee is employed in repairing a water tank along a track, one used to supply interstate trains, operated over an interstate track, with water, he is employed in interstate commerce, but if he is engaged in constructing along such a track and for such purpose a new tank which, because of its incompleteness, has not yet been used by the carrier, he is not employed in such commerce. We see no good reason for such artificial distinctions, for the one as directly relates to the interstate commerce in which the carrier is engaged as does the other.

Here the remarks of Mr. Justice Van Devanter are pertinent, when he said that it is an erroneous assumption

"that the interstate commerce by railroad can be separated into its several elements, and the nature of each determined regardless of its relation to others, or to the business as a whole," and that "the true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged?"

Viewed from that standpoint, we think it clear that one employed in installing and equipping the road with the block signals was engaged in doing something which was a part of the interstate commerce in which the defendant was engaged, to the same extent as one engaged in repairing a

44 Utah—12

bridge or a track used in such commerce. The evidence, without dispute, shows, and the defendant, on the record, unqualifiedly admitted, that the signals were installed to carry on and were in furtherance of, the interstate commerce in which the defendant was engaged. On the record it is clear that they were put in for no other purpose. They, not remotely, not incidentally, but directly related to such commerce, for they afforded protection against obstructions on, or breaks in, the track, were attached to, and operated in connection with it—in a sense a part of it—and thus tended to promote the safety, not only of the employees engaged in the operation of interstate trains, but of passengers transported from state to state, to the same extent that the repair of a track promoted such safety, and were no less indispensable to the interstate commerce in which the defendant was engaged than are many repairs on a track, bridge or car. We see no room for any middle ground by making a new test. Was the particular thing on which the employee was engaged completed or uncompleted, or was it at the moment the injury was inflicted in actual use. The question is, What direct relation to, or connection with, the business of interstate commerce in which the defendant was engaged did the work have at or upon which the employee was engaged? The case is to be ruled either by that test, and as laid down by Mr. Justice Van Devanter, who spoke for the court, or as stated by Mr. Justice Lamar in his dissenting opinion, that the employee must be engaged in transportation, in the moving of traffic. The opinion of the former is binding on us, and seems to be more in accord with the spirit and purpose of the act, the history of which, and the legislation with respect to it, show that Congress intended to include every employee whom within its constitutional powers it could include. (*Horton v. Oregon-Washington R. & Nav. Co., supra; Colasurdo v. Central R. R. of New Jersey* (C. C.) 180 Fed. 832.)

District Judge Trieber, in *Watson v. St. Louis I. M. & S. Ry. Co.* (C. C.) 169 Fed. 942, in speaking of the act, said:

"The object of Congress in the enactment of the law was to protect the men employed in this hazardous occupation, in which thousands are annually killed or maimed without any fault of the master himself, but by the negligence of other employees, over whom the servant has no control, and in whose selection he had no voice. The legislation is neither new nor revolutionary,"

and is in compliance with the demands of an enlightened public opinion.

"The enactment of such a statute not only results in protecting the employees of carriers by rail, but at the same time guards the public welfare by securing the safety of travelers. . . . Congress having the exclusive power to regulate interstate commerce, that power necessarily includes the right to regulate the relation of master and servant operating such trains and legislate for the safety of the employees."

District Judge Morris, in *Kelley v. Great Northern Ry. Co.* (C. C.) 152 Fed. 211- 227, observed:

"It seems to me to be apparent that it (Congress) had in contemplation the protection of the lives and persons of the employees of such carriers whose employment had any relation to such commerce, and that it enacted the statute for that purpose, and by its provisions changed certain common-law rules determining liability in order to promote that object by securing a more careful selection of employees, a closer and more careful supervision of them, and a more rigid enforcement of their duties, and thus to promote the public welfare."

And in *Mondou v. New York, N. H. & H. R. Co.,* 223 U. S. 1-50, 32 Sup. Ct. 169, 175 (56 L. Ed. 327, 38 L. R. A. [N. S.] 44), Mr. Justice Van Devanter for the court said:

"The natural tendency of the changes [from the common-law by the statute] described is to impel the carriers to avoid or prevent the negligent acts and omissions which are made the basis of the rights of recovery which the statute creates and defines; and, as whatever makes for that end tends to promote the safety of the employees and to advance the commerce in which they are engaged, we entertain no doubt that in making those changes Congress acted within the limits of the discretion confided to it by the Constitution."

Mr. Doherty, in his work, Liability of Railroads to Interstate Employees (section 17, p. 89) says:

"The act may fairly be interpreted to include all mechanics who are engaged at the time of injury upon instrumentalities which are generally and indiscriminately used for all the purposes of an interstate railroad, as, for instance, linemen, track repairers, and laborers engaged in the general maintenance of the interstate highway or its signal wires or apparatus, and those whose duties relate to the construction, maintenance, and repair of those instrumentalities which are used in the business conducted by the interstate railroad without discrimination between the local or interstate character of its traffic."

And that, in effect, is what was decided by the Supreme Court of the United States in the Pedersen Case.

The further point is made that the deceased, at the time of the injury, was not engaged in any work, but was on way to his abode; hence the relation of master and servant did not then exist between him and the defendant, and for that reason he was not then "employed in such commerce." We think that also is answered against the respondent by the Pedersen Case. But the observations of the court in the case of *Phila., B. & W. R. Co. v. Tucker*, 35 App. D. C. 123, affirmed by the Supreme Court, 220 U. S. 608, 31 Sup. Ct. 725, 55 L. Ed. 607, are here pertinent:

"When Tucker was killed he was upon the premises of the defendant in response to its call, to assume the duties he had been engaged by the defendant to assume, and for their mutual interest and advantage. Can it be that under such circumstances the relation which the decedent sustained to the defendant was that of a mere stranger? Is it possible that the act under consideration warrants a distinction so fine as to permit a master to escape liability for negligence resulting in the injury of one hired to perform service, because the injury occurs before the service is actually undertaken, notwithstanding that, at the time of the injury, the servant is properly and necessarily upon the premises of the master for the sole purpose of his employment? We think not. Such a rule, in our view, would be as technical and artificial as it would be unjust. We think the better rule, the one founded in reason and supported by authority, is that the relation of master and servant, in so far as the obligation of the master to protect his servant is concerned, commences when the servant, in pursuance of his contract with the master, is rightfully and necessarily upon the prem-

ises of the master. The servant in such a situation is not a mere trespasser nor a mere licensee. He is there because of his employment, and we see no reason why the master does not then owe him as much protection as he does the moment he enters upon the actual performance of his task."

To the same effect are the cases of *Horton v. Oregon-Washington R. & Nav. Co., supra; Stone-Webster Engineering Corporation v. Collins,* 199 Fed. 581 118 C. C. A. 55; *Helmke v Thilmany,* 107 Wis. 216, 83 N. W. 360; *Ewald v. C. & N. W. R. Co.,* 70 Wis. 420, 36 N. W. 12, 591, 5 Am. St. Rep. 178; *Packet Co. v. McCue,* 17 Wall. 508, 21 L. Ed. 705.

We think the relation of master and servant between the deceased and the defendant with respect to the latter's liability for the charged negligence as clearly existed at the time of the injury as though the deceased then had been actually engaged in his work along the track.

From these considerations it follows that the case falls within the provisions of the congressional act in question, and that the plaintiff was entitled to go to the jury on that theory. And, for the reasons heretofore given, the judgment of the court below is reversed, and the case remanded for a new trial. Costs to the appellant.

McCARTY, C. J., concurs.

FRICK, J. (dissenting in part).

I am unable to yield assent to the conclusion reached by my Associates upon the proposition that the deceased was employed in interstate commerce while he was engaged in constructing the "block signal system" as explained in the majority opinion. It will be observed that the portion of the system upon which the deceased was employed on the day of the accident was not, and never had been, devoted to either interstate or intrastate commerce. Indeed it had not, as yet, been dedicated or devoted to any use in connection with the operation of trains; and the record shows that, for the rea-

son of its unfinished condition, it could not have been so used. Conceding, therefore, that when that portion of the block signal system upon which the deceased was working on the day of the accident, when completed, would be so related to the interstate commerce in which respondent was engaged as a common carrier as to make that portion a part of such commerce, yet such was not the fact at the time of the accident. This fact alone, in my judgment, differentiates this case from all others that are cited and relied on by my Associates. I do not doubt that if before the accident occurred the block signal system had been installed and used in connection with the operation of trains for any length of time, under the holding in the case of *Pedersen v. Delaware, I. & M. R. Co.*, 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, by the Supreme Court of the United States, it would have constituted part of the instrumentalities or appliances devoted to or used in interstate commerce. I cannot yield assent to the doctrine, however, that any instrumentality or appliance which is merely intended to be used in interstate commerce at some future time can, during the process of construction, either in fact or in law, be said to form a part of such commerce, or that such instrumentality or appliance can, within the purview of the federal statute, be held to be a part of, or used in connection with, interstate commerce. That it was intended to exclude all such instrumentalities and appliances is, in my judgment, clearly stated by Mr. Justice Van Devanter in the Pedersen Case *supra,* in the following words:

"Of course we are not here concerned with the construction of works, bridges, engines, or cars which have not as yet become instrumentalities in such commerce, *but only with the work of maintaining them in proper condition after they have become such instrumentalities and during their use as such.*" (Italics mine).

In another portion of the opinion the Justice was careful to state that the bridge which was being repaired or reconstructed was "being regularly used in both interstate and intrastate commerce" at the time of the accident.

In the case at bar it must be, and in fact is, conceded that the part of the block system on which the deceased was employed on the day of the accident never had been used for any purpose, and had not yet progressed sufficiently in its construction so that it could be used for the purpose for which it was intended. It is true that portions of the system had been completed and were in use both to the east and to the west of the portion which was being constructed, but the latter portion had not, and could not have been, used. I concede that, under the ruling of the Pedersen Case, *supra,* if the block signal system had been used at any time before the accident and it required alteration or repair, and the deceased had been injured while he was in some way employed in that work, he necessarily would have been deemed to have been employed in interstate commerce. Such, however, is not the case here; and this case, in my judgment, falls clearly within the exception—if I may so designate it—pointed out by Mr. Justice Van Devanter as contained in the quotation I have made from him above. If it can be said that under the undisputed facts of this case the deceased was employed in interstate commerce within the purview of the federal statute, then I can conceive of no case where a person is injured while engaged upon an instrumentality or appliance which is intended to be used in interstate commerce, or which is intended to be made a part of an instrumentality which is in fact used in such commerce, where we would not be required to hold that such person was, as a matter of law, employed in interstate commerce. If it once be held that an instrumentality or appliance which it is intended shall be used in interstate commerce is, as a matter of law, already a part of such commerce, then the scope of the statute must, in my judgment, be extended far beyond both its present language and spirit, and far beyond anything that is said in the Pedersen Case, *supra.*

As I understand Mr. Justice Straup, his conclusion is based entirely upon the theory that the block signal system on which the deceased was working on the day of the accident both in fact and in law constituted a part of the interstate

commerce in which respondent was engaged. This conclusion, moreover, is based upon the test laid down in the Pedersen Case, *supra,* which is stated in the following words:

"The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged?"

It is assumed that, because the block signal system in question, when in use, is, at intervals, in some way, physically connected with the track for the purpose of operating the trains therefore it is a part of the track, and, that being so, it is used in connection with interstate commerce so as to make it a part thereof. This reasoning seems to me to be fallacious. The block signal system is certainly not a part of the track in the sense that it makes the track as such stronger or better. True, when in use, the system, at intervals, is physically connected with the track, but that is so only for the purpose of convenience and safety in operating the trains that pass over the track from time to time. A hand car or any other car for that matter, when in use, is also in physical contact with the track, but I think no one would, for that reason, contend that they are, or that either is, a part of the track. A switch bar, when in use, is physically attached to the rail, but would any one contend that an employee who is making a new switch bar is employed in interstate commerce, although such switch bar is intended to be placed in use at some future time? But, as I understand the evidence, the block signal system was not attached to the track at the place where the deceased was working on the day of the accident. As I read the record, the deceased, with another employee was engaged in marking out the places where the holes were to be dug in which the poles were to be placed on which the wires were to be strung, which wires were to be connected with the track, and by means of which the signals were to be automatically operated. These poles were no more a part of the track at the time of the accident than are telegraph poles that are being placed in the ground along the track before the telegraph wires are placed thereon.

Would anyone seriously contend that, because a telegraph line was intended to be used in connection with the operation of interstate trains, for that reason an employee, who is engaged in indicating where the holes in which the poles were to be placed should be dug, is engaged in interstate commerce? No doubt all of the things I have enumerated, when once in use, may be so connected with the operation of the railroad as to constitute them a part of it, and thus be devoted to the furtherance of interstate commerce. As I read the test laid down in the Pedersen Case, it is therein clearly implied that an instrumentality or appliance in order to bring it within the federal statute, must, at the time of the injury, be used in interstate commerce or must at some prior time, have been so used, and if at the time it was not in actual use it nevertheless was being altered or repaired for further use in such commerce. I think no case has gone beyond this.

In my judgment the ruling of the district court that the deceased was not employed in interstate commerce was clearly right.

In view of the facts, I concur in the conclusions reached upon the other features of the case by Mr. Justice Straup.

ON REHEARING.

STRAUP, J.

A petition for rehearing is filed on the grounds that we erred in holding (1) that the plaintiff was entitled to go to the jury on questions of alleged negligence independently of the congressional act, and (2) that the deceased was employed in interstate commerce. The first is based on this: That the congressional act "has superseded both the common and statutory law on the same subject." That is, as we understand the contention, an employee of an interstate carrier, to recover for an injury alleged to have been inflicted by the negligence of such carrier, must predicate his action on that act; and, if he is not entitled to recover thereunder, he cannot recover at all. Or,

putting it in other words, that the act deprives him of all common law rights of action, though the facts and circumstances alleged are such as to entitle him to sue either at common law or under statutory law. We cannot yield assent to that. The purpose of the act is not to abridge, but to enlarge, liability of interstate carriers. A case falling within that act of course may be predicated upon it. But if it does not fall within it, then may the injured employee pursue his common-law rights of action, if the facts and circumstances alleged are such as to enable him to sue either at common law or under statutory law. Any other conclusion leads to this: An employee of an interstate carrier, injured while engaged in purely local commerce through the negligence of such a carrier, would be deprived of all rights to recover. He could not recover under the act because he was not himself employed or engaged in interstate commerce. He could not recover at common law or under statutory law because the act, as is asserted, supersedes these. Surely Congress did not intend any such thing as that.

In this connection the further claim is made that the plaintiff presented and tried the case wholly on a theory predicated on the act, and for that reason is it asserted that, if she was not entitled to recover under that act, she was not entitled to recover at all. The record does not disclose any such theory. In the original complaint facts and 11, 12 circumstances are alleged which entitle plaintiff to recover under the act if the deceased was employed in interstate commerce within the meaning of the act; and, if he was not, the alleged facts and circumstances, nevertheless, are such as to entitle her to recover independently of the act. In the original complaint the plaintiff pleaded an Idaho statute permitting a recovery for wrongful death. The defendant pleaded a later Idaho statute requiring among other things, the giving of notice "to the employer" within 150 days, and that no such notice was given. Then, on plaintiff's motion, the paragraph of her complaint relating to the Idaho statute was stricken. The defendant then filed a new answer to "plaintiff's amended complaint," in which it denied the al-

leged negligence and pleaded assumption of risk and contributory negligence, but did not plead the Idaho statute. So neither the amended complaint nor the answer thereto contains any averments of, nor makes any reference to, any statute of Idaho, or to any other state or federal statute. Such amended complaint and the answer thereto superseded the original complaint and the original answer. Hence, by the pleadings on which the case was tried and submitted no statute of Idaho, as stated in our original opinion, was either pleaded or put in evidence. When the paragraph of the complaint relating to the Idaho statute was stricken the complaint stood as though no such statute was pleaded, and the plaintiff left to invoke the presumption that the law of Idaho was the same as the law of the forum. The defendnt still, if it desired to rely on an Idaho statute to overcome the presumption could have pleaded it and put it in evidence. It did neither. The court was required to administer and apply the law of the jurisdiction until the law of the *situs* was shown. The latter was neither pleaded nor shown, and hence the court was required to administer and apply the former. The law of the jurisdiction was the congressional act, if the deceased was engaged in interstate commerce within the meaning of that act; if he was not, or if that act for any other reason was not applicable and did not control the case, then the law of Utah, where the common law of England, so far as not repugnant to or inconsistent with the Constitution and laws of the United States or the Constitution and laws of this state, is "the rule of decision in all the courts of this state." In our original opinion we pointed out that Utah statutes permit recovery for wrongful death and modified the common law as to the doctrine of fellow servants. Evidence was adduced by both parties to show the facts and circumstances of the accident, the manner in which the injury was inflicted, the business conducted by the defendant, the relation of the parties, and the employment of the deceased and the character of work performed by him. Upon that evidence the defendant requested a direction of the verdict in its favor. That mo-

tion was based, not only on the ground that the deceased was not, within the meaning of the congressional act, employed or engaged in interstate commerce, but also on the grounds that the deceased was guilty of contributory negligence, assumed the risk, and on the further ground of want of evidence, not to show negligence on the part of an agent or employee of the defendant, but to show that "the defendant was guilty of either of the negligent acts or omissions complained of in plaintiff's complaint." The motion thus specified grounds, and was broad enough to invoke a ruling directing a verdict, not only on the ground that the congressional act did not apply, because the deceased was not employed in interstate commerce, but also on the grounds, though he was not so employed, of contributory negligence, assumption of risk, and on the further ground that, even though there may be evidence to show negligence on the part of some agent or employee of the defendant, yet there was none to show that the defendant was guilty of negligence, or that there was any negligence for which it was legally responsible. And when the court granted the request and directed the verdict, it did not do so alone on the ground that the deceased was not employed in interstate commerce, but also on the grounds that he was guilty of contributory negligence, and assumed the risk, and on the further ground that the defendant owed him no duty whatever, except to refrain from injuring him after discovering him on the track. We, therefore, think the record does not support the contention that the case was tried and submitted wholly on a theory predicated on the congressional act. Of course the plaintiff from beginning to end asserted, and the defendant denied, that the case is within the act. But it is shown the motion for a directed verdict was in fact made and granted, not only on the ground that the case is not within the act, but also on other grounds heretofore stated. We do not find anything on the record that the plaintiff by her pleadings, evidence, or otherwise, took a position that her right to recover was based only on the congressional act. To the contrary we find that the defendant, when it interposed its motion for a direction of the

verdict, did not take such a position; nor did the court in ruling on the motion directing the verdict.

Now, as to the last ground—our holding that the deceased was employed in interstate commerce. We have given that question painstaking consideration. That is what divides us. Since courts all over the country, both state and federal, so widely disagree on conclusions as to when employees of interstate carriers are engaged or employed in interstate commerce, our disagreement is not surprising. The petition as to this point presents nothing new. It is but a re-argument of what heretofore was fully argued, considered, and determined. But we have again carefully considered it. We are still divided. We recognize much may be said on both sides of the question, but we think all has been said and presented that can be said or presented. We do not see wherein a rehearing can further aid us. So let the petition be denied and the record remitted.

McCARTY, C. J., concurs.

FRICK, J. (concurring in part, dissenting in part). On the first proposition I fully concur with Mr. Justice Straup. A careful examination of the pleadings and the proceedings had at the trial has convinced me that the conclusions reached upon that question are entirely sound. I, however, dissent from the conclusions reached by my Brethren upon the second proposition, for the reasons stated in my former dissenting opinion. Upon that proposition I think a rehearing should be granted.